## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**TROY SCHOOL DISTRICT and**
**THE BOARD OF EDUCATION OF**
**THE TROY SCHOOL DISTRICT,**

      **Plaintiffs,**

**v.**

**K.M., JANICE M. and WARREN M.,**

      **Defendants.**

_____/

**CASE NO. 12-CV-15413**

**HON. DENISE PAGE HOOD**

### ORDER DENYING PLAINTIFFS' MOTION FOR JUDGMENT
### ON THE ADMINISTRATIVE RECORD OR
### ALTERNATIVELY SUMMARY JUDGMENT IN PLAINTIFFS' FAVOR,
### ORDER DENYING MOTION TO SUPPLEMENT RECORD, AND
### ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

## I.    BACKGROUND

This matter is before the Court on a First Amended Declaratory, Monetary and Equitable Relief Complaint filed by Plaintiffs/Counter-Defendants Troy School District ("District") and the Board of Education of the Troy School District ("Board") (collectively, the "District"). A due process hearing was held in this matter pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* at the request of the parents of Minor Student K.M. ("K.M.") challenging the March 21, 2012 Individualized Education Program ("IEP") developed for K.M. The Parents of K.M. ("Parents") did not agree with the IEP and filed a due process complaint on April 12, 2012. (Am. Comp., ¶¶ 97, 98) A hearing was held before the Administrative Law Judge ("ALJ") over a three week period in June and July 2012. (Am. Comp., ¶ 102) The ALJ issued a 100-page Decision and Order on October 12,

2012 finding against the District.  (Am. Comp., ¶ 103)

The District filed the instant action seeking review of the ALJ's decision alleging three counts:  Appeal of the ALJ Decision and Order under § 1415 of IDEA (Am. Comp. Count I); Appeal of the ALJ Decision and Order under M.C.L.A. § 380.1751(1) and (3) (Am. Comp. Count II); and Appeal of the ALJ Decision as Violative of the Spending Clause of the United States Constitution (Am. Comp. Count III).  Defendants filed a Counterclaim seeking reimbursement of attorney fees and costs as the prevailing party during the due process hearing (Am. Counterclaim Count I)

K.M. is eligible for special education and related services under IDEA and under the Michigan Mandatory Special Education Act ("MMSEA"), M.C.L. §§ 380.1701 to 1766.  (Am. Comp., ¶ 4)  K.M., at 12 years old in the seventh grade, was diagnosed with Asberger's syndrome, an autism spectrum disorder, with Attention Deficit Hyper-activity Disorder ("ADHD") and Oppositional Defiant Disorder ("ODD").  (Am. Comp., ¶¶ 5, 20)  Plaintiffs serve the vast majority of students with disabilities, including students with autism and those with behavioral challenges, within the general education public schools operated by the District, as determined by the student's IEP team and the student's unique circumstances.  (Am. Comp., ¶ 18)  On rarer occasions, a student with a combination of severe challenges who exhibits dangerous and extremely disruptive behaviors requires services and support of a county center program in a general public school or in a county center program that operates as a separate facility serving only students with disabilities.  (Am. Comp., ¶

2

20)

K.M. received special education services as a student with emotional impairment ("EI") from second grade through sixth grade in the District. (Am. Comp., ¶ 21) The District asserts that K.M.'s inappropriate behaviors escalated and intensified upon his transition from elementary school to middle school, including verbal threats directed at staff and other students, screaming, throwing objects, self-injurious head-banging against windows and walls. (Am. Comp., ¶ 22) Professionals and providers who have evaluated K.M., including those retained by the parents, have found K.M.'s behavior escalates within seconds from a calm state to a peak level of intensity; such episodes typically last from 45 minutes to over an hour in duration. (Am. Comp., ¶ 23)

During the 2010-11 school year, K.M.'s sixth grade year, the District convened seven IEP team meetings to address K.M.'s increasingly dangerous and disruptive behaviors. (Am. Comp., ¶ 25) The IEP team meetings included Review of Existing Evaluation Data ("REED") and re-determination of K.M.'s eligibility category as a student with autism spectrum disorder. (Am. Comp., ¶ 26) The District also convened twelve additional behavior planning sessions regarding K.M., which were attended by the Parents, various District staff and District-retained outside behavior consultants and therapists. (Am. Comp., ¶ 27) Other meetings were also held with the Parents, the District staff and K.M.'s treating psychologist. (Am. Comp., ¶ 28) Despite all of these meetings and plans, K.M. continued to regress throughout K.M.'s sixth grade school year. (Am. Comp., ¶ 29) As a result of K.M.'s episodes, eight

3

evacuations of general or special education classrooms were made and emergency responders were contacted on five occasions. (Am. Comp., ¶¶ 24, 31-32)

On April 19, 2011, the Parents and the District agreed that K.M. would begin homebound services, which commenced April 25, 2011. The IEP team met in May 2011 and redetermined K.M.'s eligibility as a student with autism spectrum disorder and revised the IEP to provide for homebound services for the remainder of the school year. (Am. Comp., ¶ 37)

On June 2 and 6, 2011, the IEP was finalized for the start of K.M.'s seventh grade year, providing for 10 to 100 minutes per day in a classroom for students with autism spectrum disorder, with the remainder of his schedule in general education classrooms. (Am. Comp., ¶ 38) A behavior intervention plan was finalized on June 8, 2011, where the classroom environment accommodations would no longer provide a personal healthcare aide ("HCA") in all classes nor would it include a directive to the HCA to intervene early to reduce escalation of physical or aggressive behaviors. (Am. Comp., ¶ 39) Instead, an autism-trained healthcare aide would be assigned to K.M. to assist, along with the autism-certified teacher, the autism-trained school social worker and other autism-trained support staff, in teaching K.M. replacement behaviors, but they would not provide personal, one-on-one assistance in all classroom environments. (Am. Comp., ¶ 40) An additional adult support, Mr. DeVault, was also available in all classes provided by K.M.'s teacher. (Am. Comp., ¶ 41) The changes to K.M.'s IEP and behavior intervention plan were made because a one-on-one aide triggered K.M.'s aggressive behaviors, according to the District.

4

(Am. Comp., ¶ 42)

On the fourth day of the seventh grade, September 9, 2011, K.M. escalated instantaneously in his math classroom, throwing chairs at his teacher, the adult support, and students. K.M. cursed and yelled, "Leave me alone you mother fucker," "I'm going to kill you," and "I'm going to kill the students." (Am. Comp., ¶ 45) When Mr. DeVault removed K.M. from the room, K.M. bit Mr. DeVault in the leg through his jeans, drawing blood and leaving a bite mark. (Am. Comp., ¶ 46) K.M. continued screaming through the hallway, frightening other students. (Am. Comp., ¶ 47) When K.M. was released to his father, K.M. bolted out the school door, entering and exiting the woods on the edge of the school property. (Am. Comp., ¶¶ 48-49) K.M. found a log, measuring 55 inches in length and 9 inches in circumference, and charged back toward the school attempting to crash the log through a classroom window. (Am. Comp., ¶¶ 50-51) K.M.'s father stepped in front of him and K.M. struck him with the log in the head and neck area. (Am. Comp., ¶ 51)

The District claims K.M.'s behavior violated numerous provisions of the Student Code of Conduct and put other students at risk of serious bodily injury. (Am. Comp., ¶ 52) The District determined that K.M. should be recommended for a long-term suspension or expulsion. (Am. Comp., ¶ 53) The District determined that K.M. searched and seized a weapon, possessed it on school property, and used it on school property to strike a person, and that K.M. caused serious bodily injury when he bit the teacher. (Am. Comp., ¶ 56)

The District convened an IEP meeting on September 21, 2011 to determine

5

whether the September 9 misconduct was a manifestation of K.M.'s disability and to determine K.M.'s 45-school day Interim AE Setting.  (Am. Comp., ¶ 57)  The IEP team thereafter placed K.M. at Edison MAX ("Edison"), a center-based EI program operating pursuant to Mich. Admin. R. 340.1741.  (Am. Comp., ¶ 58)  K.M.'s Interim AE Setting also included a Statewide Autism Research and Training-trained consultant for 2 to 4 times per month, consultation and/or direct service from a behavioral consultant/psychologist for 1 to 3 times per week at 30 to 60 minutes per session, and consultation and/or direct service from a child psychologist who specializes in autism and self-regulation for 2 to 5 times, at 50-60 minutes per session. (Am. Comp., ¶ 59)  The Parents did not agree with the Interim AE Setting placement of K.M. at Edison and kept K.M. home from school, which did not allow the District to implement the Interim AE Setting or behavior intervention plan.  (Am. Comp., ¶ 61)

On October 18, 2011, the District filed a due process complaint asserting that the Parents wrongfully prevented K.M. from participating in the Interim AE Setting placement, which was settled between the District and Parents on October 28, 2011. (Am. Comp., ¶¶ 62-63)  The ALJ dismissed the due process complaint on October 28, 2011 based on the Settlement Agreement signed by the parties.  (Am. Comp., ¶ 64) The Settlement Agreement provided that K.M. would attend an autism center program in Oakland County for a period of 30 school days.  K.M. attended the program at Orchard Lake Middle School from November 14, 2011 to January 6, 2012, at which time K.M. experienced continued behavioral episodes.  (Am. Comp., ¶¶ 65-66)  On

January 6, 2012, Maureen Ziegler ("Ziegler"), a Statewide Autism Research and Training consultant and autism expert retained by the District, observed K.M. (Am. Comp., ¶ 71) K.M. had an episode where he threw items at staff and began climbing into the ceiling. 911 emergency was contacted and K.M.'s parents arrived. (Am. Comp., ¶¶ 73-76) K.M. came down from the ceiling and left with his mother. (Am. Comp., ¶ 76)

The educational professionals who observed K.M. on January 6, 2012 discussed having K.M. evaluated through the Oakland Schools Intermediate School District at Havenwyck Hospital in Oakland County, a psychiatric and substance abuse hospital for children. (Am. Comp., ¶ 77) K.M.'s parents indicated K.M. would not be at Havenwyck for the evaluation. (Am. Comp., ¶ 79) Because the District had difficulty in scheduling an IEP tem meeting with K.M.'s parents, the District provided homebound services to K.M., commencing January 26, 2012. (Am. Comp., ¶ 79) At the IEP meeting held on February 2, 2012, K.M.'s parents expressed that they would not consent to any further evaluations. (Am. Comp., ¶ 80) Several IEP meetings between the District and the Parents were held in February and March, 2012. (Am. Comp., ¶¶ 82-85) On March 21, 2012, the IEP team determined that K.M. would be placed at Edison, Oakland County's center-based EI program after considering several options. (Am. Comp., ¶¶ 89-96) K.M.'s parents disagreed with the IEP team's decision to place K.M. at Edison. (Am. Comp., ¶ 97) The due process complaint thereafter was filed by K.M.'s parents on April 12, 2012, contesting K.M.'s IEP of March 21, 2012, in its entirety. (Am. Comp., ¶¶ 98-100)

In their Counterclaim, the Parents assert K.M. is an extremely bright, compassionate and engaging 13-year old student, who is eligible for special education based on an autism spectrum disorder ("ASD"). (Am. Counterclaim, ¶ 10) K.M. is involved in the community, participating in Boy Scouts, First Lego League and many sports. (Am. Counterclaim, ¶ 11) K.M. is highly motivated to learn, wants to do well in school, wants to be accepted by his peers, to be understood by school staff and to feel welcomed at school. (Am. Counterclaim, ¶ 12) Because of his ASD, his social interaction and communication skills are impaired and he has difficulty maintaining peer relationships and interpreting and responding to social cues. (Am. Counterclaim ¶ 12)

On September 21, 2011, the Parents vigorously opposed the proposed IAES that would send K.M. to Edison for 45 days. (Am. Counterclaim, ¶ 62) Edison is considered a dumping ground for students with the worst behavioral challenges and the Parents felt that this was not appropriate for K.M. (Am. Counterclaim, ¶ 62) When the IEP decision on March 21, 2012 was to place K.M. full-time at Edison through February 27, 2013, the Parents rejected the IEP and thereafter filed a due process complaint on April 12, 2012. (Am. Counterclaim, ¶ 82) The Parents and K.M. prevailed in the due process hearing and seek attorney fees and costs. (Am. Counterclaim, ¶ 97)

This matter is before the Court on the District's Motion for Judgment on the Administrative Record, or alternatively, Summary Judgment. A response and reply have been filed. The Parents filed a Motion for Leave to File a Sur-Reply brief which

8

is opposed by the District.  The parties agreed that the attorney fees and costs issue raised in the Counterclaim will not be addressed at this time.  A hearing was held on the District's motion.

## II.    ANALYSIS

### A.    IDEA Claim

#### 1.    Standard of Review

Count I of the Complaint seeks review of the ALJ's decision under the IDEA statute.  In an IDEA action, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(B).  An initial reviewing court should make an independent decision based on the preponderance of the evidence, but also should give "due weight" to the determinations made during the state administrative process.  *Deal v. Hamilton County Bd. of Educ.,* 392 F.3d 840, 849 (6th Cir. 2004)(citing, *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206 (1982)).  Under a "modified de novo" standard of review, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings.  *Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764 (6th Cir. 2001).  The district court must not simply adopt the state administrative findings without an independent review of the evidence, but neither may the district court substitute its own notions of sound educational policy

for those of the school authorities which it reviews.  *Deal,* 392 F.3d at 849.  Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation; more weight, however, is due to an agency's determinations on matters for which educational expertise is relevant.  *Id.* (quoting *McLaughlin v. Holt Pub. Sch. Bd. of Educ.,* 320 F.3d 663, 669 (6th Cir. 2003)).

The purpose of the IDEA is to give children with disabilities a free appropriate public education ("FAPE") designed to meet their unique needs.  *Deal,* 392 F.3d at 853.  School districts receiving funds under the IDEA are required to establish an IEP for each child  with a disability.  *Id.*  The IEP must contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress.  *Id.*; 20 U.S.C. § 1401(a)(20).

The district court must engage in a two-part inquiry in suits under the IDEA. First, the court must determine whether the school system has complied with the procedures set forth in the IDEA.  Second, the court must assess whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefits.  *Deal,* 392 F.3d at 853-54.  If these requirements are met, the school system has complied with the obligations imposed by Congress and the courts can require no more.  *Id.* at 854.  Parties challenging the IEP have the burden of proving by a preponderance of the evidence that the IEP devised by the school district is inappropriate.  *Id.*

10

As to whether procedural requirements were met, the court should strictly review an IEP for procedural compliance, although technical deviations will not render an IEP invalid. *Id.* Only if a procedural violation has resulted in substantive harm may relief be granted. *Id.* Greater deference is to be afforded to the district's placement decision if the procedural requirements of the IDEA are met. *Id.* As for substantive compliance, the court must be careful to avoid imposing its view of preferable educational methods upon the school districts since the primary responsibility for formulating the educational needs of the child was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child. *Id.* Federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the fact-finding of a state agency, which is presumed to have expertise in the field. *Id*.

### 2.    First Inquiry:  Compliance of IDEA Procedures as to IEP

The ALJ found various procedural violations by the District, specifically under 34 C.F.R. § 300.503(a) which requires that the District must provide prior written notice before proposing or initiating a student's placement change. (ALJ Opinion, p. 96)  The notice must provide details regarding the proposed action, the reasons for the proposal, evaluation reports supporting the action, whether procedural safeguards were made available to the parents and/or student, other options considered and an explanation as to why options were rejected. 34 C.F.R. § 300.503(b)(1)-(7). The ALJ also found that the District violated 34 C.F.R. § 300.116(b)(2) which requires that a student's educational placement is based on the student's IEP. The school is required

to convene a Manifestation Determination Review ("MDR") under the IDEA at 20 U.S.C. § 1415(k)(1)(E), which provides that the IEP Team and parents shall review all relevant information in the student's file if there is a violation of the code of student conduct.  Such a review includes any teacher observations and any relevant information to determine whether the conduct in question is a manifestation of the student's disability and whether the conduct in question was a direct result of the school's failure to implement the student's IEP.  20 U.S.C. § 1415(k)(1)(E).  The ALJ indicated that there were several significant changes in placement where such notice was not provided to the Parents.  The ALJ also found that the District failed to conduct an MDR, which the ALJ found was a significant and substantial procedural violation. (ALJ Opinion, pp. 96-97)  The ALJ cited several instances based on the testimony and evidence submitted in the Findings of Fact.

The ALJ found that K.M.'s removal from general education on March 15, 2011 was a procedural violation since no IEP Team meeting was held and there was no corresponding IEP changing K.M.'s placement to the main office.  (ALJ Opinion, ¶¶ 110-111)  The ALJ further found that K.M.'s continued placement in the main office through at least May 12, 2011 constituted a change in placement from general education with resource room support, without an IEP.  (ALJ Opinion, ¶ 129)  The ALJ also found that many times the parents received no formal notice of K.M.'s suspension and it would be unclear what his status was.  (ALJ Opinion, ¶ 141)  The ALJ found that there was no IEP Team meeting to change K.M.'s placement from general education and resource room to homebound and there was no MDR for any

12

change in placement on April 21, 2011.  (ALJ Opinion, ¶ 142)

Although the June 2 and 7, 2011 IEP, Goals and Objectives were collaboratively drafted and everyone on the IEP Team agreed that the goals and objectives were appropriate, the ALJ found that the services and supports set forth in the June 2011 IEP were not implemented "with fidelity."  (ALJ Opinion, ¶ 202) K.M.'s mother testified that other supports were not in place on September 9, 2011 including that no additional set of books were provided for home.  Nor were any copies of peer/teacher notes sent home with K.M.  (ALJ Opinion, Par. 200) There was no review of the course schedule by the special education staff before the schedule was sent to the parents.  (ALJ Opinion, Par. 200) During the September 9, 2011 incident, there was no other adult present besides the math teacher when K.M. began to escalate.  (ALJ Opinion, Par. 201) The June 2011 IEP provided for an Additional Adult Support for K.M.  After the September 2011 incident, there was no debriefing as required by the June 2011 IEP.  (ALJ Opinion, Par. 203) On October 28, 2011, the parties entered into a settlement agreement which placed K.M. at the West Bloomfield Orchard Lake Middle School.  (ALJ Opinion, Par. 222)

The ALJ found that many of the provisions of the October 2011 settlement agreement were not fulfilled.  (ALJ Opinion, Par. 223) K.M. did not receive any of the required elective courses, such as health, physical education, computers or keyboarding, French, Italian or band.  (ALJ Opinion, Par. 225) K.M. was placed, by himself, in a sensory room connected to the ASD room for 1/2 days while at West Bloomfield.  (ALJ Opinion, Par. 232) K.M. did not see a psychologist within the 30

days required by the October 2011 settlement agreement. (ALJ Opinion, Par. 235) West Bloomfield Schools did not allow K.M. to return, even though K.M.'s doctor recommended that K.M. should be returned to school. (ALJ Opinion, Par. 260) The ALJ found that the District's argument that it need not pay the psychiatrist evaluating K.M. because K.M.'s parents were attempting to "control the process" as "disingenuous." (ALJ Opinion, Par. 402) The ALJ found that the District could not legitimately complain that the expert the District had selected was so easily subject to K.M.'s "control." (ALJ Opinion, Par. 402)

The IEP was amended on February 2, 2012, to be effective March 1, 2012. (ALJ Opinion, Par. 269) IEP Team meetings were held on February 28, 2012, March 9, 2012 and March 21, 2012. (ALJ Opinion, Par. 321-22) The March 21, 2012 IEP Supplementary Aids and Services was intended to be implemented in a general education building with special education support. (ALJ Opinion, Par. 329) It was agreed that the primary consideration at the March 9, 2012 meeting was safety. (ALJ Opinion, Par. 334) K.M. was not permitted to go to general education classes for the first 11 days. (ALJ Opinion, Par. 337) At the March 21, 2012 IEP Team meeting, K.M.'s parents believed that key participants did not attend the meeting. (ALJ Opinion, Par. 340) When placement was discussed at the meeting, the IEP Team usually begins with the Least Restrictive Environment ("LRE"), but Katherine Jagels, the District's Director of Special Education, was supporting a placement to Edison, which the parents believed was a pre-determined decision. (ALJ Opinion, Par. 340) The school staff agreed to the Edison placement, which was opposed by K.M.'s

14

parents.  (ALJ Opinion, Par. 342-43)  The supervisor of Edison never observed K.M., even though this was part of the referral process.  (ALJ Opinion, Par. 351)  Experts testified that K.M. would not respond to a consequence or reinforcement system in place at Edison, since such a system presumes K.M. is misbehaving intentionally. (ALJ Opinion, Par. 354)  The ALJ found that the level system in place at Edison would not be modified for K.M.  (ALJ Opinion, Par. 356)  Edison has no staff certified in ASD.  (ALJ Opinion, Par. 357)

The ALJ found that K.M.'s education progress had not been measured since the 3rd marking period of 2011.  (ALJ Opinion, ¶ 395)  K.M.'s father testified that K.M. received honors in math, but that K.M. now needs support in math and science, and writing.  (ALJ Opinion, ¶ 396)

After reviewing the parties' arguments and submissions before the ALJ and this Court, the Court finds that there were several substantial procedural violations by the District.  The record shows that the District repeatedly isolated K.M. during the 2010-11 school year and unilaterally imposed homebound schooling for K.M.  The record further shows that there were changes in placement of K.M. without notice to the Parents, without convening an IEP or without conducting an MDR.  This occurred in January 2011 and in April 2011.  No MDR was convened in January 2011 when K.M. was suspended in excess of 20 school days without an MDR to review K.M.'s pattern of behavior.  K.M. was placed on homebound schooling in January 2011 which violated the IEP.  K.M.'s placement was changed in April 2011 to May 12, 2011, without an MDR.

As to the June 2011 IEP, which contained significant changes from previous IEPs, this IEP was never fully implemented by the beginning of the September 2011 school year. Changes were made to the IEP, even though the IEP Team did not agree on the changes. There was no staffing/adult support for K.M. on September 9, 2011 as required by the IEP. (Tr. 1314, 1364, 2086) There was no debriefing by the IEP Team after the September 9, 2011 incident which was provided for in the IEP. K.M. was excluded from school after the September 9, 2011 incident, but homebound services were not initiated until October 31, 2011 and after January 6, 2012. K.M. was prevented from interacting with his peers. K.M. was unable to attend physical education, music, computer, keyboarding, foreign language or music classes. (Tr. 1183-84, 1218, 1225-26)

In addition to the Court's de novo review of the matter, the Court notes that the ALJ conducted a thorough hearing, including reviewing the testimony of multiple witnesses and thousands of documents. The administrative record before the ALJ was filed with the Court which included in excess of 5,200 pages. (See Doc. Nos. 23-39) The Court considered the administrative record in its review, in addition to the briefs and exhibits submitted by the parties. The Court's finding of a substantial violation is based on its *de novo* review of the matter and also gives "due deference" to the ALJ's decision and review of the matter.

### 3. Second Inquiry: whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefits

The March 21, 2012 IEP removed K.M. from the general education

environment.  The Sixth Circuit applies three criteria to determine whether the child may be removed from the general education environment in compliance with the IDEA's preference for mainstreaming:  1) whether the disabled student would benefit from inclusion in general education; 2) whether such benefits would be outweighed by benefits that are not provided in an inclusive setting; and 3) whether the disabled child disrupts the general education setting. *Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir. 1983).

Because the Court found above that the District committed substantial procedural violations, the Court need not defer to the District's placement of K.M. and the removal of K.M. from the general education environment. The evidence submitted shows that K.M. would benefit from the inclusion in general education.  Ms. Ziegler, the state autism expert, testified that placement at a school such as Edison, a segregated facility, would not be a first choice for a student with ASD, such as K.M. (Tr. II, p. 364; Tr. IV, p. 846) Robin Billings, Ph.D., a psychologist, testified that K.M. is extremely bright, learns rapidly and has an industrious work ethic and wants to be successful.  (Tr. VII, pp. 1504-07)  Dr. Billings testified that K.M. can educated in a general education class room, with the right support and a proper ASD program. (Tr. VII, pp. 1543-46) Ira Glovinski, Ph.D., a psychologist, testified that if K.M. were in a safe and welcoming environment, he could be satisfactorily educated in a general education setting with supports.  (Tr. II, p. 462) Dr. Glovinski found K.M. presented not as a child with conduct disorder, but a child who has been scared.  (Tr. II, p. 463) Dr. Glovinski further found that K.M. is not a danger to himself or others such that he

17

should be excluded from a general education building.  (Tr. II, P. 463) Dr. Glovinski testified that K.M. expressed a desire to be in a general education classroom, as opposed to being isolated.  (Tr. II, pp. 455-56) David Meador, co-founder of Autism Alliance of Michigan, testified that it is possible to successfully transition a student with ASD to the general education and that peer-to-peer support and mainstreaming is critical as students with ASD learn from being acclimated with neuro-typical peers. (Tr. I, pp. 234, 236) A center-based program, such as Edison, is not a helpful placement and does not assist with learning how to interact with non-disabled peers. (Tr. I, pp. 238-39)

This Court finds that inclusion in general education would greatly benefit K.M. The evidence shows that K.M. could be successfully included in general education if the proper support was in place.  The testimony shows that interacting with non-disabled peers is critical to K.M.'s success in school.  The testimony establishes that K.M. is a bright student and is able to learn quickly.  The first criteria that inclusion in general education would benefit K.M. is met.

As to the second criteria, the Court finds that the benefit of inclusion in general education far outweighs the benefit of being in a more restrictive setting, such as Edison.  The main reason why the District advocated for a more restrictive setting was K.M.'s behavior, which also goes hand in hand with the third criteria, whether K.M. disrupts the general education setting.

Dr. Glovinski testified that K.M. has a high degree of reactivity and is on high alert because he is afraid of what is going to happen to him.  (Tr. II, pp. 423-24)

18

Police involvement, restraints and seclusion can be frightening for any student, but more so for a student with disabilities. Mr. Meador from Autism Alliance, testified that a good ASD program with highly trained teachers using evidence based methods and a least restrictive environment, with peer to peer support would benefit K.M. Kelly Dunlap testified that when a student is experiencing a melt-down, it is easy for the school staff to say that the plan is not working. She further testified that visual supports and visual schedules are important modifications for students with ASD. (Tr. II, pp. 285-86) Peer-to-peer support is also critical in that it affects how a student develops socially and academically, and allows the student to be more independent. (Tr. II, pp. 288-89; Tr. IV, pp. 770, 776-77) If a student perceives staff to be agitated, then the student escalates. Ms. Dunlap further testified that a behavioral plan could be implemented for six to eight weeks, with fidelity, before staff decides that a student cannot be educated in the general education environment. (Tr., II, pp. 330-31) Punishment-based strategies often do not work on students with ASD because of the neurological impact of the autism. (Tr. II, pp. 344-46)

The Court finds that because the June 2011 IEP and PBSP were never properly implemented, that placement at a more restrictive school, such as Edison, is inappropriate since the least restrictive placement set forth in the June 2011 IEP was never implemented. Evidence established that the West Bloomfield placement did not follow the IEP in that K.M. had a negative association with an authoritarian principal and an unwelcome environment. The more restrictive environment of Edison or similar placement would not benefit K.M. Although K.M. has disrupted the general

19

education setting, those incidents could be more controlled if the staff was properly trained and the IEP was properly followed. After weighing the three criteria required, the Court finds that the Parents have shown under the preponderence of the evidence standard that the March 21, 2012 IEP is not an appropriate IEP for K.M. Count I of the Complaint is dismissed.

### B.    MMSEA Claim

Count II of the District's Complaint seeks review of the ALJ's decision under the MMSEA, M.C.L. § 380.1701 *et seq.* The Parents argue that the state law claim is barred by waiver and failure to exhaust administrative remedies because the claim was not raised before the ALJ.

Participating states under the IDEA, such as Michigan, must certify to the Secretary of Education that they have policies and procedures that will effectively meet the IDEA's conditions. *See,* M.C.L. § 380.1701 *et seq.* The MMSEA Michigan has chosen to enhance IDEA's requirements by requiring that an IEP be "designed to develop the maximum potential" of the handicapped child. M.C.L. § 380.1701(a). The MMSEA was enacted under the IDEA, which required the implementation of IEPs. *Griffin v. Sanders,* 2013 WL 3788826, at *10 n. 6 (E.D. Mich. Jul. 19, 2013). Administrative remedies must be exhausted before resorting to the courts. *See, Jenkins v. Carney-Nadeau Public School,* 201 Mich. App. 142, 144 (1993).

A review of the matter below shows that the complaint filed before the ALJ was filed under the IDEA. (ALJ Opinion, p. 1) The ALJ's decision shows it was based on the IDEA statute. Nothing in the decision refers to the MMSEA. The Court is unable

to review any allegations under the MMSEA since such was not addressed by the ALJ. It is noted that the United States Supreme Court held that where the IDEA provides a remedy, it is the exclusive avenue for redress. *See, Smith v. Robinson,* 468 U.S. 992 (1984). The Court declines to review the ALJ's decision under the MMSEA. Count II of the Complaint is dismissed.

## C. Violation of the Spending Clause of the United States Constitution

In Count III, the District asserts that the ALJ's decision violated the Spending Clause of the United States Constitution because it required a one-on-one psychologist for K.M. which is not required under the IDEA. (Am. Comp. Count III). The Parents respond that the only condition under the IDEA is that the relief be "appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

The IDEA statute was passed by Congress pursuant to the Spending Clause of the United States Constitution. U.S. Const., Art. I, § 8, cl. 1; *Arlington Cent. School Bd. of Educ. v. Murphy*, 548 U.S. 291, 295 (2006). The IDEA provides federal funds to assist state and local agencies in educating children with disabilities "and conditions such funding upon a State's compliance with extensive goals and procedures." *Arlington*, 548 U.S. at 296. Congress has broad power to set the terms by which it disburses federal money to the States, but when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out "unambiguously." *Id.* Courts must view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds. *Id.* In considering whether the IDEA provides

21

clear notice, courts should review the text of the statute.  *Id.*  If the language is plain, the sole function of the courts–at least when the disposition required by the text is not absurd–is to enforce it according to the terms.  *Id.*  Although the school district may have legitimate financial concerns, the court's role is to interpret existing law.  *Cedar Rapids Community School Dist. v. Garret F.*, 526 U.S. 66, 77 (1999).  Accepting a school district's cost-based standard as the sole test for determining the scope of the provision would require the court to engage in judicial lawmaking without any guidance from Congress, which creates a tension with the purposes of the IDEA.  *Id.* Congress intended "to open the door of public education" to all qualified children and "require[d] participating States to educate handicapped children with nonhandicapped children whenever possible."  *Id.* at 78 (quoting *Board of Ed. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 192 (1982).  Under the IDEA, the term "related services" means "other supportive services" including "psychological services" designed to enable a child with a disability to receive a FAPE as described in the IEP of the child.  20 U.S.C. § 1401(26)(A).

The ALJ ordered that as "compensatory education" for K.M.'s educational loss in social and behavior management skills, the placement will include "a full-time, one-on-one ASD trained psychologist or psychiatrist assigned to the Student, known as the Student's safe person."  (ALJ Opinion, p. 99) The ALJ directed the parties to work collaboratively to retain this person and that the order was through the 2013 school year.  The Court finds that the ALJ's order did not violate the IDEA and the Spending Clause of the Constitution since the IDEA expressly provides psychological services

to the child. IDEA's main purpose is to promote the education of children with disabilities with children without disabilities whenever possible. IDEA expressly provided for related services which includes psychological services. In this instance, and based on the testimony and facts before the ALJ which established that K.M. requires an ASD trained psychologist or psychiatrist, the one-on-one psychologist assigned to K.M. as a safe person does not violate the IDEA. It is also noted that the ALJ directed the parents and the District to collaborate regarding the retention of this person. The IDEA requires a collaboration between the District and the Parents to establish an IEP for K.M. The parties should so heed such requirement on future IEPs for K.M., in light of K.M.'s situation. Count III of the Complaint is dismissed.

## III.   PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION

On December 19, 2014, the District filed a second Motion for Preliminary Injunction prohibiting K.M. from returning to Athens High School to receive educational services. The Parents respond that the District should abide with the stay put provision after the matter is reviewed by the ALJ. On January 16, 2015, the Court denied Plaintiffs' Motion for Temporary Restraining Order. The ALJ has since issued a decision on January 29, 2015 ordering that K.M. be returned to Athens High School. (Doc. No. 75)

Because the Court has now issued its decision dismissing all of the District's claims, the Court no longer has any matter to review as it relates to the previous ALJ decision. Since a new decision has been issued based on a recent Due Process Hearing, as noted by the ALJ, a party aggrieved by the decision may seek judicial

review by filing an action within 90 days of the date of the order. The Court declines to review the January 29, 2015 ALJ Decision since it is not properly before the Court. Even if the matter was properly before the Court, for the reasons set forth below, the Court denies the Motion for Preliminary Injunction.

"The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Four factors must be balanced and considered before the Court may issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a): 1) the likelihood of the plaintiff's success on the merits; 2) whether plaintiff will suffer irreparable injury without the injunction; 3) the harm to others which will occur if the injunction is granted; and 4) whether the injunction would serve the public interest. *In re Delorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985); *In re Eagle-Pitcher Industries, Inc.*, 963 F.2d 855, 858 (6th Cir. 1992); and *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989). The first factor is the most critical inquiry of the four criteria. *Mason County Med. Ass'n v. Knebel,* 563 F.22d 256, 261 (6th Cir. 1977). In making its determination the "district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,* 119 F.3d 393, 399 (6th Cir. 1997).

As to the first factor, likelihood of success on the merits, the Court has now dismissed the District's claims in its February 27, 2013 Amended Complaint. Without ruling on the merits of the ALJ's decision of January 29, 2015, it appears that based on those findings, the Court finds the District cannot prevail on the merits as to the

24

issues which were before the ALJ.  The ALJ found that K.M. is not substantially likely to cause injury to himself or others with the proper support.  (Doc. No. 75, Pg ID 7324) The ALJ also found that the District had some responsibility in the escalation of the two level 5 incidents.  (*Id.*)

Regarding the second factor, whether the District will suffer irreparable injury, the Court finds that based on the ALJ's findings, again without ruling on the merits of the issues before the ALJ, the Court finds that the District has failed to carry this burden for the same reasons set forth in the first factor.

The third factor, the harm to others, as this Court has now ruled in K.M.'s favor, the Court finds K.M. would suffer great harm from not participating in general education since the statute requires the least restrictive educational setting for K.M.

Addressing the fourth factor, there is public interest in keeping all students and others safe while in school, but there is also a public interest in having a student with a disability participate in the least restrictive educational setting.  Again, the ALJ found that the District failed to establish by a preponderance of the evidence that maintaining K.M. at Athens High School is substantially likely to result in injury to K.M. or others.  (Doc. No. 75, Pg ID 7325)

Weighing the factors set forth above, the Court finds that the District has failed to show that a preliminary injunction should be issued in this case.  The Court denies the District's Motion for Preliminary Injunction.

## IV.  CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Plaintiffs' Motion for Judgment on the Administrative Record or Alternatively for Summary Judgment in Favor of Plaintiffs **(Doc. No. 39)** is DENIED.  The Court finds in favor of Defendants as more fully set forth above. Plaintiffs' Complaint is DISMISSED with prejudice.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Supplement the Record **(Doc. No. 53)** is DENIED as it relates to the Court's review of the ALJ's decision.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Preliminary Injunction **(Doc. No. 67)** is DENIED.

IT IS FURTHER ORDERED that as to the Amended Counterclaim, after the parties have conferred on the remaining claims, the following briefing schedule is set:

| | |
|---|---|
| Any dispositive motion must be filed by: | May 22, 2015 |
| Any response must be filed by: | June 19, 2015 |
| Any reply must be filed by: | July 3, 2015 |
| A hearing on the motion is set for: | July 15, 2015, 2:00 p.m. |

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  March 31, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 31, 2015, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager